1  Gary J. Aguirre (SBN 38927)
   Aguirre Law, APC
2  501 W. Broadway, Ste. 800
   San Diego, CA 92101
3  Email: Gary@aguirrelawfirm.com
   Tel: 619.400.4960/Fax: 619.501.7072
4
   Daniel M. Gilleon (SBN 195200)
5  Mitchell | Gilleon Law Firm
   1320 Columbia Street, Suite 200
6  San Diego, CA 92101
   Email: dmg@mglawyers.com
7  Tel: 619.702.8623/Fax:619.702.6337

8  Attorneys for Plaintiff Rodolfo Michelon

9
                **UNITED STATES DISTRICT COURT**
10
           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
11

12
13  Rodolfo Michelon,                          '12CV1014 JAH  MDD
    1698 Docena Rd.
14  Carlsbad, CA 92011

15                    Plaintiff,
                                               **COMPLAINT FOR DECLARATORY**
16        v.
                                               **AND INJUNCTIVE RELIEF UNDER THE**
17  Securities and Exchange Commission
    100 F Street N.E.                          **FREEDOM OF INFORMATION ACT**
18  Washington, DC 20549,

19  and

20  Federal Bureau of Investigation
    935 Pennsylvania Avenue, N.W.
21  Washington, D.C. 20535-0001

22                    Defendants.

23
24
25
26
27
28

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, to compel Defendant United States Securities and Exchange Commission ("SEC") and the Federal Bureau of Investigation ("FBI") to produce, provide access to, and make available certain records specified below that were requested by Plaintiff.

### JURISDICTION

2.  This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B).

### PARTIES

3.  Plaintiff is a citizen of the United States and, at all relevant times, is and was a resident of the County of San Diego, State of California.

4.  Defendant SEC is an agency of the United States Government and has possession and control of the records that are the subject of this action.

5.  Defendant FBI is an agency of the United States Government and has possession and control of the records that are the subject of this action.

### PUBLIC INTEREST

6.  The facts underlying this complaint raise an issue of the highest public interest. The SEC has been entrusted with a power and duty of "great social and economic significance to the American people." Section 200.53 of Title 17 of the United States Code of Federal Regulations spells out that trust:

> Members of the Securities and Exchange Commission are entrusted by various enactments of the Congress with powers and duties of great social and economic significance to the American people. It is their task to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private enterprise system serves the welfare of all citizens. Their success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions.

7.  Few principles are more deeply ingrained in Title 17 of the Code of Federal Regulations, which governs how the SEC must execute its powers and duties, than the mandates obligating the SEC to handle all of its affairs, including the enforcement of the securities laws, with impartiality. In short, the Code of Federal Regulations, as specified below, requires that Justice remain blindfolded at the SEC. No conduct would stray farther from those mandates than a double set of laws: one for the wealthy well-connected and another for everyone else.

8. Section 922 of the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") amended the Securities Exchange Act of 1934 ("Exchange Act") to create a whistleblower incentive program which would be administered by the SEC pursuant to rules and regulations promulgated by the SEC. The whistleblower provisions of the Dodd-Frank Act were intended to create financial incentives and protections for individuals within financial institutions and public companies who provide the SEC with high quality information and evidence of major violations of the securities acts. Congress intended and expected the whistleblower provisions in the Dodd-Frank Act to curb the unlawful practices by large financial institutions and Fortune 500 companies which caused the 2008 financial crisis and thereby prevent those unlawful practices from causing another financial crisis with its deleterious and fatal effects to the financial markets, the economy, and public.

9. Plaintiff is informed and believes, and thereon alleges, that senior officials in the SEC Division of Enforcement routinely outsource their investigations of whistleblower complaints of suspected violations of the securities acts by Fortune 500 companies, large financial institutions, and their senior executives to large and prestigious law firms retained by the subjects of those investigations. This practice operates as follows:

    A. A whistleblower such as an employee or former employee submits a whistleblower complaint pursuant to the provisions of the Dodd-Frank Act in which he or she describes how senior officials within a Fortune 500 company or large financial institution committed violations of the securities acts.

    B. The SEC provides the whistleblower complaint or a synopsis of the complaint to the company and individuals who, according to the whistleblower complaint, engaged in violations of the securities acts.

    C. The subjects of the whistleblower complaint retain a large prestigious law firm, formally of informally approved by SEC staff, which conducts the investigation of the whistleblower complaint.

    D. The approved law firms are routinely paid millions of dollars by their clients, the subjects of the whistleblower complaint, to investigate whether their clients violated

federal securities laws.

E. The law firms and their attorneys who conduct such investigations routinely defend Fortune 500 companies, large financial institutions and their senior executives in administrative, civil and criminal proceedings and therefore bring the perspective of "white collar" defense attorneys to their investigation of the whistleblower complaints which the SEC has entrusted them to conduct.

F. In conducting the outsourced investigation, said law firms and their attorneys understand they are obligated to act as zealous advocates of their clients' interests pursuant to the applicable rules of professional conduct and guidance from the highest state and federal appellate courts. In this regard, the Comment to Rule 1.3 of the American Bar Association Model Rules of Professional Conduct instructs, "A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf."

G. Given these ethical and financial incentives, the law firms and the attorneys who conduct the outsourced SEC investigations routinely issue reports and make presentations to SEC staff in which they purport to prove, find, and conclude their clients committed no violations of the securities acts.

H. On their part, SEC staff ignore the ethical and financial incentives which prompt the law firms and their attorneys to conclude their clients committed no violations of the securities acts.

I. SEC staff customarily treat the findings and conclusions of such law firms and their attorneys as if they were the result of impartial investigations of the outsourced whistleblower complaints.

J. After considering such presentations and reports, SEC staff routinely adopt the findings and conclusions of said law firms that their clients violated no provisions of the federal securities laws.

K. SEC staff thereafter customarily and routinely conclude that whistleblower complaints of violations of federal securities laws by Fortune 500 companies, large financial

institutions, and their senior executives lack merit and, on that basis, close their "investigations" of such complaints.

L. The process described in this paragraph is hereafter referred to as the SEC's "Outsourcing Program."

10. The SEC's Outsourcing Program violates Congressional mandates and expressions of public policy embodied in the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the rules and regulations implementing said acts, which empower and direct the SEC to conduct its own investigations of companies, institutions, and individuals suspected of violating said acts, rules, and regulations.

11. Plaintiff is informed and believes, and thereon alleges, that the SEC only makes its Outsourcing Program available to Fortune 500 companies, the nation's largest financial institutions and their executives. The criteria employed by the SEC in selecting the privileged few who benefit from the SEC's Outsourcing Program are unknown at this time, but, at a minimum, the service is only available to those who can afford to retain the most prestigious and expensive law firms to represent them. In this way the SEC has made a mockery of the Code of Federal Regulations which requires the SEC to be impartial in its administration and enforcement of the securities acts. Among the specific regulations mandating the SEC to be impartial are the following:

A. 17 CFR 200.55:
In administering the law, members of this Commission should vigorously enforce compliance with the law by all persons affected thereby. …In the exercise of their judicial functions, members shall …impartially determine the rights of all persons under the law.

B. 17 CFR 200.58: "A member should not be swayed by partisan demands…."

C. 17 CFR 200.61:
A member should not, by his conduct, permit the impression to prevail that any person can improperly influence him, that any person unduly enjoys his favor or that he is affected in any way by the rank, position, prestige, or affluence of any person.

D. 17 CFR 200.64:

> Members should recognize that their obligation to preserve the sanctity of the laws administered by them requires that they pursue and prosecute, vigorously and diligently but at the same time fairly and impartially…all matters which they or others take to the courts for judicial review.

    E. 17 CFR 200.67: "[T]he necessary rules should be adopted or modifications made or rules should be repealed as changing requirements demand without fear or favor."

    F. 17 CFR 200.69: " Members should be...impartial when hearing the arguments of parties or their counsel. … The Commission should continuously assure that its staff  follows the same principles in their relationships with parties and counsel."

    G. 17 CFR 200.735-2(a): "In view of the effect which Commission action frequently has on the general public, it is important that members [and] employees …maintain unusually high standards of …impartiality…"

The above regulations are applicable to both SEC commissioners and SEC staff pursuant to 17 CFR 200.735-2(b), 17 CFR 200.50, and 17 CFR 200.51).

12. Plaintiff is informed and believes, and thereon alleges, that the SEC's Outsourcing Program perpetuates itself as senior members of the SEC Enforcement staff, the Department of Justice ("DOJ") and Congressional Committees rotate in and out of Wall Street law firms, Fortune 500 companies, and large financial institutions. This rotation to and from agencies that prosecute securities violations, Congressional committees with oversight of said agencies, the financial industry, Fortune 500 companies, and the law firms that represent Fortune 500 companies and large financial institutions is commonly known as the "revolving door."

13. Plaintiff is informed and believes, and thereon alleges, that the SEC's Outsourcing Program has effectively nullified the whistleblower provisions in the Dodd-Frank Act. Plaintiff is informed and believes, and thereon alleges, that the SEC's Outsourcing Program is a major reason the SEC has not made a single whistleblower award, or at least not disclosed such an award, since the whistleblower incentive provisions in the Dodd-Frank Act became operative on July 22, 2010.

14. The SEC's Outsourcing Program has become so common and flagrant that respected newspapers have begun to focus on this practice, which demonstrates the growing public

interest and concern regarding the practice. By way of example, on January 12, 2012, the Washington Post began an article regarding the response of the U.S. Government to Plaintiff's whistleblower complaint to the SEC as follows:

> When a former employee in 2010 accused a California company called Sempra Energy of paying bribes to advance its interests in Mexico, the U.S. government responded as it often does in white-collar cases: It asked the company to investigate itself.[1]

The Washington Post explained the special connection between Sempra Energy and the law firm that conducted the investigation and reported its findings to government officials: "The law firm that represented Sempra in the April briefing for government officials was Jones Day, where Sempra's executive vice president and general counsel was formerly a partner."[2]

**HOW SEMPRA ENERGY GOT A WHISTLEBLOWER COMPLAINT OF ITS FCPA VIOLATIONS OUTSOURCED TO ITS FAVORITE LAW FIRMS**

15. Sempra Energy was at all relevant times a public company registered with the SEC and, in that capacity, periodically filed Form 10-K and 10-Q reports with the SEC pursuant to provisions of the Exchange Act. During the same relevant times, Sempra Energy's Chief Financial Officer ("CFO") and Chief Executive Officer ("CEO") have periodically filed statements with the SEC in which they certify in accordance with the applicable provisions of the Sarbanes-Oxley Act ("SOX") that the information in said Form 10-K and Form 10-Q reports for each such period contains no misrepresentations or omissions of material facts.

16. Sempra Global ("Sempra") is a wholly owned subsidiary of Sempra Energy and, at all relevant times, was a Delaware corporation with its principal place of business in San Diego County, State of California.

17. Sempra hired Plaintiff as accounting manager on July 28, 2003, to perform accounting services within Sempra Energy International which has its primary operations in Mexico, Argentina, Chile, Cayman Islands and Peru.

---

[1] David S. Hilzenrath, *U.S. Probe Relied Heavily on Firm's Own Investigation, FBI Memos Show*, Washington Post, Jan 12, 2012, available at http://www.washingtonpost.com/business/economy/us-probe-relied-heavily-on-firms-own-investigation-fbi-memos-show/2011/12/23/gIQA3kRetP_story.html.

[2] *Id.*

18. Sempra Energy promoted Plaintiff to the position of Director and Controller for Mexico on July 18, 2005. In his capacity as controller, Plaintiff had the duty to certify in reports provided to his supervisors, and ultimately to Sempra Energy to be incorporated in its filings with the SEC, and its CFO's and CEO's certifications, that Sempra's books and records accurately and fully described Sempra's operations in Mexico. The information in Plaintiff's reports would be incorporated into information provided to the CFO and CEO of Sempra Energy who in turn had the duty, with other Sempra Energy officers, to include such information in the Form 10-K, Form 10-Q, and other filings with the SEC, so that said filings would, in accordance with Generally Accepted Accounting Principles (GAAP) and SOX, accurately and fully describe the operations of Sempra Energy and its subsidiaries.

19. On January 5, 2011, Plaintiff filed a whistleblower complaint with the SEC in which he alleged, as more specifically described below, that Sempra Energy and Sempra had committed numerous acts which constitute violations of the Exchange Act and in particular violations of the Sections 13(b)(2) of the Exchange Act, commonly referred to as books and records violations, and 30A of the Exchange Act, Prohibited Foreign Trade Practices by Issuers.

20. From January 5, 2011, until March 2011, as more specifically described below, Plaintiff continued to provide information directly to the SEC supporting the allegations in his whistleblower complaint and also indirectly to the SEC by providing information supportive of his whistleblower complaint to the FBI and the DOJ, which agencies appeared to be conducting a joint investigation with the SEC of the information Plaintiff provided in support of his whistleblower complaint.

21. Plaintiff also offered to provide the SEC, FBI, and DOJ with additional information supportive of his allegations in his whistleblower complaint, as specified below, upon an informal request from the SEC, FBI, or DOJ, or upon the service of a subpoena by the SEC upon Plaintiff seeking such additional information.

22. As support for his whistleblower complaint, Plaintiff informed the SEC, DOJ and FBI that, upon commencing in his new position as Director and Controller for Mexico on July 18, 2005, Plaintiff learned from Sempra employees of irregularities in the billings from Sempra to its gas

distribution customers in Mexico. Pursuant to his duties as controller for Sempra's operations in Mexico, Plaintiff opened an investigation of said billing practices. The investigation revealed that Sempra was erroneously booking income from thousands of bills Sempra periodically sent to gas distribution customers in Mexico, which appeared to be uncollectable, e.g., customers were being billed for distribution services where the delivery system had not even been connected to the home.

23. Plaintiff is informed and believes, and thereon alleges, SEC, DOJ and FBI staff understood the false reporting of these uncollectable accounts as income would cause Sempra to report false earnings up the corporate structure through various subsidiaries to Sempra Energy where it would be erroneously reported by Sempra Energy in its filings with the SEC and thus distort the value of Sempra's assets on the balance sheet, the company's net worth, and the company's earnings. Plaintiff is informed and believes, and thereon alleges, SEC, DOJ and FBI staff understood that Plaintiff, as Sempra's controller in Mexico, was responsible for analyzing, interpreting, and controlling the accounting of Sempra's operations in Mexico to prevent the reporting of false accounting entries, such as the false earnings as alleged herein.

24. Plaintiff also informed the SEC, DOJ and FBI that his investigation of the billings procedure alleged in paragraphs 22 and 23 further revealed the management of the Sempra unit, Sempra Pipelines & Storage ("SPS"), including its chief officer and President, George Liparidis ("Liparidis"), who were responsible for the erroneous billings to nonexistent customers, were receiving large bonuses attributable to the false reporting of revenue from nonexistent customers of Sempra.

25. Plaintiff is informed and believes, and thereon alleges, that the SEC, DOJ and FBI staff understood the inaccurate recording of billings to nonexistent customers, as alleged in paragraph 22, constituted violations commonly referred to as a books and records violation. The Foreign Corrupt Practices Act ("FCPA"), enacted in 1977, added Section 13(b)(2) to the Exchange Act (15 U.S.C. § 78m(b)(2)) to require public companies, such as Sempra Energy and its subsidiaries, to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

26. Plaintiff also informed the SEC, DOJ and FBI staff that, as a consequence of Plaintiff's findings as alleged in paragraphs 21 through 23, he and his subordinates conducted a broader investigation during 2005 of Sempra's accounting practices in Mexico for the purpose of detecting other irregularities which violated Section 13(b)(2) and Section 30A of the Exchange Act, applicable SEC rules, or otherwise violated SOX.  Plaintiff and his subordinates found numerous accounting irregularities recorded in Sempra's books and records regarding the manner in which Sempra was reporting its operations in Mexico.

27. Plaintiff also informed the SEC, DOJ and FBI that Plaintiff had compiled a list of such accounting irregularities in 2005 and such list would be provided to the SEC, FBI and DOJ upon their request or pursuant to an SEC subpoena. Such list describes 178 accounting irregularities which individually and collectively constitute violations of the books and records provisions of the Exchange Act, and thus may conceal violations of Section 30A of the Exchange Act, the applicable provisions of SOX, Sempra internal accounting standards, or other applicable accounting standards.

28. The 178 accounting irregularities individually and collectively constitute violations of the books and records provisions of the Exchange Act in that they violate at least one or more provisions of Section 13(b)(2) and related SEC regulations which make unlawful the following conduct by Sempra Energy and Sempra:

    A) Failures to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer in violation of Section 13(b)(2)(i) of the Exchange Act;

    B) Failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization in violation of Section 13(b)(2)(ii)(A) of the Exchange Act;

    C) Failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting

principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets in violation of Section 13(b)(2)(ii)(B) of the Exchange Act;

D) Failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that access to assets is permitted only in accordance with management's general or specific authorization in violation of Section 13(b)(2)(ii)(C) of the Exchange Act; and

E) Failures to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences in violation of Section 13(b)(2)(ii)(D) of the Exchange Act.

29. Plaintiff also informed the SEC, DOJ and FBI that such list, as alleged in paragraphs 27 and 28, includes accounting irregularities that may conceal bribes to foreign officials in violation of Section 30A of the Exchange Act or criminal provisions of the Foreign Corrupt Practices Act (FCPA).

30. Plaintiff also informed the SEC, DOJ and FBI that he had also from time to time advised, informed and notified his supervisors, general counsel, and other senior executives of Sempra and Sempra Energy of other books and records violations with a high risk of concealing actual bribes to foreign government officials.

31. As an example of a books and records violation with a high risk of concealing actual bribes to foreign government officials, as alleged in paragraph 30, Plaintiff informed the SEC, DOJ and FBI of the events specified below.

A. On December 5, 2007, Plaintiff informed Raul Smith ("Smith"), employed by Sempra as a Senior Counsel, and Randall Clark ("Clark"), employed by Sempra as Corporate Secretary and Supervisor of Sempra's Mexican in-house counsel, of possible FCPA violations relating to consulting arrangements whereby funds were being funneled through existing Sempra consultants to third parties by SPS at the direction of Liparidis. Plaintiff provided Smith and Clark with a list of such payments which in total exceeded $200,000.

B. These transactions violated Section 13(b)(2) of the Exchange Act and the related rules and regulations, because the internal controls over cash disbursements were not sufficient to prevent indirect, unlawful payments to government officials.

C. When neither Smith nor Clark responded to the information provided to them as alleged in paragraph 30(A), Plaintiff contacted Sempra's procurement office and informed its staff of the same events and sought more information from them about these transactions.

D. On January 14, 2008, the legal department in Mexico implemented sweeping changes in its contracting practices to mitigate irregularities by contractors.

E. On January 31, 2008, after the events alleged in paragraphs 31(C) and 31(D), and as a consequence thereof, Smith issued a report finding no actual bribes had been made, effectively conceding the accounting entries and manner of handling these constituted books and records violations.

32. As another example of a books and records violation with a high risk of concealing actual bribes to foreign government officials, as alleged in paragraph 30, Plaintiff informed the SEC, DOJ and FBI of the events specified below.

A. On or about August 21, 2007, Plaintiff became aware Sempra and in particular the SPS business unit at the direction of Liparidis was constructing a Fire Station on land owned by the City of Tijuana and the building would be donated to the city.

B. On that date, Plaintiff received a request to approve an urgent payment of approximately $84,000 to a construction company, "Baja Desarollo," without any supporting documentation and without a copy of the contract, which was a violation of Sempra's procurement practices and thus a violation of Section 13(b)(2) of the Exchange Act and the related rules and regulations.

C. The invoice for this payment to "Baja Desarollo" appeared highly suspicious on its face since it was initially issued as handwritten Invoice 005, and then later replaced by a typed invoice, Invoice 001, which suggests it was the first invoice issued by the company.

D. By email, Plaintiff informed Joseph Householder, Senior VP and Corporate Controller, Mark A. Fisher, VP and Global Controller, Molly A. Cartmill, Director of Community Relations, and Juan Carlos Leon, Controller SPS, that the "donation" had been arranged by Liparidis and the SPS Business Unit through a process which bypassed the procedures Sempra would normally follow in making such a donation. This conduct further suggested the "donation" was created to conceal bribes to foreign officials.

E. Sempra management sought to capitalize the costs related to a series of donations, including the one alleged above, to "Baja Desarrollo," which would have distorted Sempra's and Sempra Energy's balance sheets and earnings by the sum of $600,000.

F. Plaintiff properly expensed the fire station costs as required by US GAAP despite the continuous pressure from Sempra executives to capitalize these costs, thereby angering those executives since proper accounting procedures had the potential to increase expenses for the SPS Business Unit and thus adversely affect the executives' anticipated bonuses.

G. Plaintiff is informed and believes, and thereon alleges, that the financing and construction of the Fire Station was a ruse to channel funds to government officials employed by the City of Tijuana. This conclusion finds support in the fact the fire station was inaugurated on November 26, 2007, by Tijuana Mayor Kurt Honold Morales (three days before the end of his term) and was abandoned shortly thereafter. On February 22, 2008, an article appeared in the newspaper "Frontera" showing a picture of the abandoned fire station covered in graffiti. The article described the rundown condition of the facility: the roof leaked and had no electrical service. Plaintiff questioned the abandonment and forwarded this article to his supervisor.

33. As another example of a books and records violation with a high risk of concealing actual bribes to foreign government officials, as alleged in paragraph 30, Plaintiff informed the SEC, DOJ and FBI of the events specified below.

A. Sempra needed a parcel of land adjacent to its planned liquefied natural gas plant to be located at Costa Azul, a community near Ensenada, Mexico. The approximately 250

acre parcel was owned by a rancher named Ramon Sanchez Ritchie ("Ritchie"). Rather than purchase the land from Ritchie, Sempra concocted a sham transaction to purchase the land from another purported owner who had died two years earlier. Sempra commenced an eviction process and commandeered Mexican police to "evict" Ritchie and his family from his property.

B. On September 14, 2006, a Sempra in-house attorney and Michael Allman, currently the President and CEO of Southern California Gas Co., called Plaintiff, who was working in Sempra's Ensenada office. They instructed Plaintiff to withdraw a sum equivalent to $16,000 USD in Mexican pesos and to use them to purchase a "bond" from the local prosecutor's office, supposedly a necessary step to lawfully evict Ritchie from the property. They also told Plaintiff he was to meet with Alex Rios ("Rios"), a Sempra employee and Mexican attorney, and together take the cash to the prosecutor's office by 3:30 p.m.

C. Believing this was a legitimate deal, Plaintiff went to the bank, withdrew the cash, and prepared to meet with Rios at 3:30 p.m. as he had been told.

D. Rios went to Sempra's office in Ensenada at 10:10 p.m. and took receipt of the funds purportedly to deliver them to the local prosecutor's office to obtain the bond, which, however, had closed several hours before.

E. At approximately 3 a.m., Sempra employees and armed police evicted Ritchie and his family from their residence; Michael Morgan, an official at Sempra, operated the bulldozer that leveled Ritchie's home, all of which was recorded on a videotape.

F. Three weeks later, on October 5, 2006, Jessie Knight, a past California Public Utilities Commissioner and currently the CEO of San Diego Gas and Electric ("SDG&E"), approved a $22,000 all-expenses-paid trip to Venice, Italy, as a "bonus" to Rios.

G. On approximately March 10, 2010, Plaintiff learned of a decision of a Mexican Court which held that Ritchie was the rightful owner of the property. This decision and the circumstances surrounding Sempra's use of Mexican police to forcefully evict Ritchie from his home point to the conclusion Sempra had bribed an official in the Mexican

government to force Sanchez Ritchie from his home.

H.  Shortly thereafter, recalling the cash drop several years earlier, Plaintiff began searching for and demanded that Sempra provide him with documentation related to the September 14, 2006, bond, as Plaintiff was concerned Sempra had misrepresented the true circumstances of the bond payment. Sempra refused and instead had its private security force remove Plaintiff from his workplace.

34. As another example of a books and records violation with a high risk of concealing actual bribes to foreign government officials, as alleged in paragraph 30, Plaintiff informed the SEC, DOJ and FBI of the events specified below.

A.  On or about August 24, 2006, Plaintiff became aware Sempra executives were complaining to Plaintiff's supervisors that his staff was obstructing a $5 million payment to a "charitable trust" established for the benefit of the city of Ensenada. This trust was similar to a trust used by another public company, which according to SEC charges against that company, was used to make bribes to foreign officials in violation of the FCPA.

B.  On that date, Plaintiff sent an email to senior Sempra executives stating his staff was acting in good faith, following company policy, and being prudent in the manner in which they were handling the transaction. Plaintiff appended to his email supporting documentation which indicated Sempra's lack of compliance with the trust's obligations, a violation of Sempra's procurement practices and thus a violation of Section 13(b)(2) of the Exchange Act.

C.  Plaintiff also provided the same Sempra executives with a detailed description of the manner in which the trust was out of compliance with the trust documents. This lack of compliance created the circumstances where trust funds could be diverted to bribe foreign officials.

35. Plaintiff also informed the SEC, DOJ and FBI that a few weeks before Sempra promoted Plaintiff to controller for all of Mexico, Interfor, widely known and respected as an international corporate intelligence and investigations firm, issued a report ("Interfor Report"), attached

hereto and incorporated by reference as Exhibit 1. Plaintiff is informed and believes, and thereon alleges, the Interfor Report accurately describes the events it purports to describe and, in doing so, accurately describes the culture of corruption that Sempra embraced in conducting its operations in Mexico. In particular, the Interfor Report describes how a highly paid Sempra operative named Francisco Molina repeatedly bribed government officials to gain "preferential treatment to Sempra Energy Company" over one of its competitors in obtaining approvals for its liquefied natural gas plant to be constructed in Ensenada, Baja California. In describing Sempra's culture of corruption in Mexico, the Interfor Report includes the four examples specified below.

A. "There are reports that [Molina] was involved in making a payoff to the Minister of Energy, Felipe Calderon Hinojosa [current President of Mexico], to obtain final approval for the Costa Azul Project... [Molina] was also reported to have made payments into the bank account of Eugenio Elorduy Walther [former Governor of Baja California] in the Cayman Islands and that additional payments were made to Ernesto Ruffo Appel (also in the Cayman Islands), former Governor of Baja California."

B. A close, longtime associate of Molina's (Gaston Luken Garza) "developed a close relationship with Sempra and the various companies that have won construction bids with Sempra." According to Interfor, Gaston Luken Aguilar "sold all of his shares in Proxima Gas to Sempra last year," and "[t]wo reports from confidential sources report the sale of Proxima Gas shares was the vehicle used to make funds available to pay off the Governor for 'help and support.' Money for this payment was said to have gone through Switzerland."

C. Interfor's sources also confirmed that Gaston Luken "is seen at the Governor's mansion on a weekly basis." The Interfor report continues, "This source has overheard conversations with Luken and Elorduy regarding deposits in the Cayman Islands. The Governor has also been overheard talking on the telephone with someone in Switzerland named Felipe."

D. "The Governor is known to make these calls to Switzerland at 3 am [sic]. It is believed that Felipe handles the Governor's banking in Switzerland. The same source has also witnessed the Governor's wife ironing $100 dollar bills in order to remove the odor of mold."

36. Defendants SEC and FBI did not conduct its own investigation of Plaintiff's allegations, as contemplated by the Exchange Act and the Dodd-Frank Act. Instead, the SEC, the FBI and the DOJ outsourced their investigations of Plaintiff's allegations to two large law firms with close ties to Sempra. Plaintiff has obtained copies of FBI reports describing the investigation undertaken by the SEC and other governmental agencies of Plaintiff's allegations. Those reports demonstrate the SEC, FBI and DOJ had sufficient information to open and conduct their own investigations. By way of example, the FBI concluded in a written report on March 15, 2011, that:

> STATEMENT THAT REQUISITE LEVEL OF PREDICATION EXISTS:
>
> Based upon the above-described information, to include the clear indication of a quid pro quo arrangement regarding the Ensenada Trust as documented internally by Sempra LNG's CFO, the apparent lack of controls over distributions from the Trust, and the risk factors related to the country in which Sempra took these actions as well as the business sector in which the Company operates, there are ample facts and indicators which reflect that Sempra and its business executives may have engaged in criminal activity so as to Justify the opening of a full investigation.

A copy of said FBI report is attached hereto and incorporated by reference as Exhibit 2.

37. Notwithstanding the "ample facts and indicators which reflect that Sempra and its business executives may have engaged in criminal activity," i.e., violation of the Foreign Corrupt Practices Act, over which the SEC has jurisdiction, neither the SEC nor the FBI conducted an investigation. Rather, pursuant to the SEC's Outsourcing Program, SEC, FBI and DOJ staff outsourced their investigations to Baker & McKenzie and Jones Day, the law firm in which Sempra's General Counsel had been a partner. Not surprisingly, Baker & McKenzie and Jones Day concluded that Sempra had violated no provision of the Exchange Act. The SEC, DOJ and FBI accepted the conclusions of Baker & McKenzie and Jones Day without question and closed their investigations.

38. The SEC's Outsourcing Program encourages Sempra, Sempra Energy, and their executives to indirectly make false statements to SEC, DOJ, and FBI staff, which would normally constitute violations of  18 U.S.C. § 1001. Because of the unique procedures implicit in the SEC's Outsourcing Program, no such violations can be prosecuted. The Outsourcing Program

insulates Sempra executives from making any direct statements to SEC, DOJ, and FBI staff and, in the absence of such statements, said Sempra executives cannot violate 18 U.S.C. § 1001, despite the fact they indirectly provided false statements through their attorneys to SEC, FBI and DOJ staff. The process operates as follows:

 A. Sempra executives provide information, which includes false statements and omissions of material facts, to their attorneys in response to the information Plaintiff provided in support of his whistleblower complaint;

 B. Sempra executives have not made any false statements to government officials and therefore no factual basis for a  18 U.S.C. §1001 violation arises;

 C. Sempra attorneys in good faith accept the statements of their client's executives as facts; Sempra's attorneys then present the same "facts" in good faith to SEC, DOJ and FBI staff and said attorneys commit no violation of 18 U.S.C. § 1001, even though the facts they have communicated to SEC, FBI and DOJ staff are either false or half truths.

39. By its letter of May 13, 2011, the SEC informed counsel for Sempra and Sempra Energy that it had closed its investigation of Plaintiff's whistleblower complaint as alleged herein. A copy of said May 13, 2011, letter is attached hereto and incorporated by reference as Exhibit 3.

40. By letter of November 14, 2011, pursuant to the applicable provisions of FOIA, Plaintiff requested access to and copies of certain documents, records and files:

 1) All records relating to Sempra's payment of money or transfer of other assets to Mexican government agencies, their officials, or officials directly or indirectly;
 2) All records relating to or mentioning Sempra's possible involvement in funding the construction of a fire station in Tijuana, Mexico, and its possible motivations for doing so;
 3) All records relating to Sempra's alleged payments of charitable and political donations in excess of $25,000 in Mexico;
 4) All records relating to Sempra's use of and payments to consultants in Mexico from 2005 through 2010;
 5) All records relating to the circumstances of Sempra's construction of the Casa Azul Conference Center;
 6) All records relating to the payment of a bond to the Ensenada's Attorney General's Office (Ensenada AG) in connection with the eviction of Ramon Eugenio Sanchez Ritchie and his family in 2006;
 7) All records provided by Sempra obtained from the Ensenada AG evidencing the existence of the bond at any time;
 8) All records obtained from Sempra indicating that Ensenada AG had refunded the

COMPLAINT
18

100,000 pesos to Sempra in relation to the bond it posted in 2006 (as described in Request No.6 above), including of any documents Sempra obtained from the Ensenada AG showing the issuance of the check and a copy of the check in the sum of 100,000 pesos (Check No. 0037149);

9) All records generated or received by the Enforcement Division from November 1, 2010, through October 31, 2011, regarding possible violations of the securities acts by Sempra, including the FCPA;

10) Any records of any investigation (preliminary, informal, or formal) or matter under inquiry from January 1, 2001, to the present relating to Sempra;

11) Any and all notes, memorandums, minutes, records and other records of meetings or phone calls between Enforcement staff (including William McKean, Jennifer Moore and Karen Martinez) and agents, employees, or representatives of the law firm of Baker & McKenzie from November 1, 2010, through October 31, 2011, relating to Sempra, including meetings on or about January 25, 2011, February 16, 2011, March 10, 2011, and April 29, 2011;

12) All correspondence, emails, and other written communications, including enclosures, between any member of Enforcement staff (including William McKean, Jennifer Moore and Karen Martinez) and agents, employees, or representatives of the law firm of Baker & McKenzie from November 1, 2010, through October 31, 2011, relating to Sempra;

13) Any opinion letter, and related documents, provided by Baker & McKenzie to Enforcement staff relating to any possible violations of the FCPA by Sempra in relation to its operations in Mexico or elsewhere;

14) Any and all notes, memorandums, minutes, records and other records of meetings or phone calls between Enforcement staff (including William McKean, Jennifer Moore and Karen Martinez) and agents, employees, or representatives of the law firm of Jones Day from November 1, 2010, through October 31, 2011, relating to Sempra, including meetings on or about January 25, 2011, February 16, 2011, March 10, 2011, and April 29, 2011;

15) All correspondence, emails, and other records in the form of communications, including enclosures, between any member of Enforcement staff (including William McKean, Jennifer Moore and Karen Martinez) and agents, employees, or representatives of the law firm of Jones Day from November 1, 2010, through October 31, 2011, relating to Sempra;

16) Any opinion letter, and related documents, provided by Jones Day to Enforcement staff relating to any possible violations of the FCPA by Sempra in relation to its operations in Mexico or elsewhere;

17) The Winston & Strawn opinion letter requested by FBI representatives from Sempra's counsel during the meeting held on or about April 29, 2011;

18) All records of any closed investigation or MUI relating to, involving, or mentioning Sempra from January 1, 2001, through the present, including copies of any Form 19A or 19C, Form 1569, Form 470, Form 140 or any other electronic or hard copy forms generated in connection with such investigation or MUI.

A copy of said November 14, 2011, letter is attached hereto and incorporated by reference as Exhibit 4.

41. Plaintiff is informed and believes, and thereon alleges, that Defendant SEC maintains all records described in paragraph 40 in one or more systems of records.

42. By letter dated December 9, 2011, SEC staff responded to Plaintiff's November 14, 2011, request under FOIA as follows:

> An initial search of our computerized systems of records identified four (4) investigative cases concerning Sempra Energy that may be responsive to your request.
>
> We indentified approximately 52 boxes of material in the investigations of Sempra Energy (LA-03654) and Duke Energy Corp (A-2738), in which Sempra Energy was a related party that may be responsive to your request.

A copy of said December 9, 2011, letter is attached hereto and incorporated by reference as Exhibit 5.

43. By his letter of December 15, 2011, Plaintiff responded in part to the SEC's December 9, 2011, letter as follows: "You may disregard my November 14 FOIA request to the extent it calls for records relating to Duke Energy Corporation." A copy of said December 15, 2011, letter is attached hereto and incorporated by reference as Exhibit 6.

44. By his letter of December 15, 2011, Plaintiff also requested clarification regarding an investigation referred to in the SEC's letter of December 9, 2011, as LA-03654. In this regard, Plaintiff's letter requested the following information:

> Regarding the other matter (LA-03654), please specify the number of boxes involved, the period of the investigation, the description of the types of violations, e.g., FCPA, and all other information available on the "computerized systems of records" on this matter or, in the alternative, a printed copy of the information on this matter as recorded in the "computerized systems of records."

45. By his letter of December 15, 2011, Plaintiff also requested clarification with regard to two other investigative cases concerning Sempra Energy referred to in the SEC's December 9, 2011, letter. In this regard, Plaintiff's letter requested the following information:

> I am also requesting the same information on the other two "investigative cases concerning Sempra Energy," i.e., number of boxes involved, the period of the investigation, the description of the types of violations and all other information available on the "computerized systems of records" on this matter or, in the alternative, a printed copy of the information on this matter as recorded in the "computerized systems of records."

46. By his letter of December 15, 2011, Plaintiff also informed the SEC that his November 14, 2011, FOIA request sought information regarding an inquiry or investigation conducted by the Salt Lake Regional Office (SLRO). In this regard, his December 15 letter clarified his November 14, 2011, request under FOIA as follows:

> I also note there is no reference to matters under inquiry (MUIs) in your responsive letter, which is surprising since the FBI has released records pursuant to FOIA of its joint investigation with the Commission and the Department of Justice. FBI records indicate it opened its investigation sometime between November 2010 and February 2011 and closed the investigation this past summer. The investigation involved whistleblower allegations by the undersigned which were reported by the San Diego Union-Tribune in November 2010.

> I know that Jennifer Moore and Karen L. Martinez, both from the Salt Lake Regional Office (SLRO), participated in a parallel Commission inquiry which was likely opened and closed at about the same times as the FBI investigation, i.e., opened as early as November 2010 and closed last summer. The FBI records document meetings and conference calls among FBI staff, Department of Justice attorneys, SEC staff, law firms representing Sempra, including Jones Day and possibly Baker & McKenzie, Sempra agents and employees, and possibly others.

> I do not know whether the recent matter involving the SLRO was conducted as a MUI, an informal investigation, or a formal investigation, though I suspect it was conducted as a MUI. As to this matter, I am requesting that you provide all records described in my November 14 request available under FOIA and Privacy Act.

> I also have concerns regarding the Commission's failure to identify the recent SLRO matter relating to Sempra, which was likely a MUI. This concern is heightened by recent media revelations about the Commission's destruction of MUI files and whether that process has actually been halted. Would you kindly advise me what steps the FOIA Office has taken to locate MUI files, either opened or closed, relating to Sempra? Are open or closed MUIs identified on "computerized systems of records" referred to in your letter?

47. By letter dated December 23, 2011, the SEC informed Plaintiff of the following:

> Initially, we have amended your request to only include records relating to the investigation "In the Matter of Sempra Energy (LA-03654), [sic] which consist of approximately two (2) boxes of records, to include information submitted by the Firm of Latham and Watkins on behalf of Sempra Energy which are subject to a request for confidential treatment. The correspondence relating to Bates Stamped materials are dated May 28, June 23, July 01, August 07, September 10, and October 29, 2009, and total approximately 465 pages...

> As previously noted in my December 09, 2011, letter we are still consulting with other Commission staff regarding additional information in two cases (to include the SLRO case and/or any MUI's) that may be responsive to your request. We will advise you of our findings, the amount of records, as well as the actual cost to review the records, as soon as we receive a response.

> Finally, in response to your request to "advise me what steps the FOIA Office has taken to locate MUI files, either opened or closed, relating to Sempra? Are open

or closed MUIs identified on "computerized systems of records" referred to in your letter." Please be advised, the FOIA provides a means for access to existing documents and is not a way to interrogate an agency. "See Patton v. United States R.R. Retirement Bd., No. ST-C-91-04-MU, slip op. at 3 (W.D.N.C. April 26, 1994), aff'd, 940 F.2d 652 (4th Cir. 1991) (table cite). Therefore, we are unable to answer questions. See *Hudgings v. IRS*, 620 F. Supp. 19, 21 (D.D.C. 1985).

A copy of said December 23, 2011, letter is attached hereto and incorporated by reference as Exhibit 7.

48. By the email dated December 26, 2011, Plaintiff's counsel again requested the SEC to produce the records related to the SLRO investigation as follows:

> While I appreciate your courtesy in responding to my client's requests in this matter, I continue to be concerned that the delay in producing the requested records is unwarranted. The files in the possession of the Salt Lake office are likely few in number (my guess approximately 50 pages) and relate to a closed investigation (see Martinez letter)…
> Please advise me when these records will be released.

A copy of the email chain including the email by Plaintiff's counsel dated December 26, 2011, is attached hereto and incorporated by reference as Exhibit 8.

49. By the email dated December 30, 2011, Plaintiff's counsel again requested the SEC to produce the records related to the SLRO investigation as follows:

> I called your office at the number indicated in the attached letter, but the response stated you were unavailable. It would seem there is little justification for the FOIA office—likely guided by the OGC—to delay the release of the records sought, which are likely in the possession of the Salt Lake Office. The existence of the records could be confirmed in a brief telephone call to Ms Martinez.
> By copy of this email, I am requesting Ms. Martinez to preserve the records.

Said email is included in the email chain attached hereto and incorporated by reference as Exhibit 8.

50. By email dated January 4, 2012, the SEC responded as follows:

> I apologize for the late response, however I have been out of the office for the holidays. In response to your messages, as previously stated in my letters of December 09 and December 23, 2011, and our telephone conversation on December 22, 2011; [sic] I am still consulting with other agency staff regarding the records you requested and will advise as to the disposition of these records when I receive a response.

I will contact that office today in an effort to ascertain their status of processing. Hopefully, I'll receive their position in the very near future.

Said email is included in the email chain attached hereto and incorporated by reference as Exhibit 8.

51. By its letter of June 1, 2011, the DOJ informed counsel for Sempra and Sempra Energy that it had closed its investigation of Plaintiff's whistleblower complaint as alleged herein. A copy of said June 1, 2011, letter is attached hereto and incorporated by reference as Exhibit 9.

52. By letter of January 2, 2012, pursuant to the applicable provisions of FOIA, Plaintiff requested the FBI to provide access to and copies of certain documents, records and files:

1) All records relating to Sempra's payment of money or transfer of other assets to Mexican government agencies, their officials, or officials directly or indirectly;

2) All records relating to or mentioning Sempra's possible involvement in funding the construction of a fire station in Tijuana, Mexico, and its possible motivations for doing so;

3) All records relating to Sempra's alleged payments of charitable and political donations in excess of $25,000 in Mexico;

4) All records relating to Sempra's use of and payments to consultants in Mexico from 2005 through 2010;

5) All records relating to the circumstances of Sempra's construction of the Casa Azul Conference Center;

6) All records relating to the payment of a bond to the Ensenada's Attorney General's Office (Ensenada AG) in connection with the eviction of Ramon Eugenio Sanchez Ritchie and his family in 2006;

7) All records provided by Sempra obtained from the Ensenada AG evidencing the existence of the bond at any time;

8) All records obtained from Sempra indicating that Ensenada AG had refunded the 100,000 pesos to Sempra in relation to the bond it posted in 2006 (as described in Request No.6 above), including any documents Sempra obtained from the Ensenada AG showing the issuance of the check and a copy of the check in the sum of 100,000 pesos (Check No. 0037149);

9) All records regarding possible violations of the securities acts by Sempra, including the FCPA;

10) Any and all notes, memorandums, minutes, records and other records of meetings or phone calls between FBI employees and agents, employees, or representatives of the law firm of Baker & McKenzie from November 1, 2010, through October 31, 2011, relating to Sempra, including meetings on or about January 25, 2011, February 16, 2011, March 10, 2011, and April 29, 2011;

11) All correspondence, emails, and other written communications, including enclosures, between any FBI employee and agents, employees, or representatives of the law firm of Baker & McKenzie from November 1, 2010, through October 31, 2011, relating to Sempra;

12) Any opinion letter, and related documents, provided by Baker & McKenzie to the FBI relating to any possible violations of the FCPA by Sempra in relation

to its operations in Mexico or elsewhere;

13)   Any and all notes, memorandums, minutes, records and other records of meetings or phone calls between FBI employees and agents, employees, or representatives of the law firm of Jones Day from November 1, 2010, through October 31, 2011, relating to Sempra, including meetings on or about January 25, 2011, February 16, 2011, March 10, 2011, and April 29, 2011;

14)   All correspondence, emails, and other written communications, including enclosures, between any FBI employee and agents, employees, or representatives of the law firm of Jones Day from November 1, 2010, through October 31, 2011, relating to Sempra;

15)   Any opinion letter, and related documents, provided by Jones Day to any FBI employee relating to any possible violations of the FCPA by Sempra in relation to its operations in Mexico or elsewhere;

16)   The Winston & Strawn opinion letter requested by FBI representatives from Sempra's counsel during the meeting held on or about April 29, 2011;

A copy of said January 2, 2012, letter is attached hereto and incorporated by reference as Exhibit 10.

53. Plaintiff is informed and believes, and thereon alleges, that Defendant FBI maintains all records described in paragraph 52 in one or more systems of records.

54. By its letter of February 6, 2012, the FBI informed Plaintiff of the following:

This responds to your Freedom of Information/Privacy Acts (FOIPA) request.

The material you requested is located in an investigative file which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A). 5 U.S.C. § 552(b)(7)(A) exempts from disclosure:

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information...could reasonably be expected to interfere with enforcement proceedings ...

A copy of said February 6, 2012, letter is attached hereto and incorporated by reference as Exhibit 11.

55. By his letter of February 14, 2012, Plaintiff appealed the decision referenced in paragraph 54 above. Attached hereto and incorporated by reference as Exhibit 12 is a copy of Plaintiff's appeal without enclosures.

56. By its letter of February 24, 2012, the FBI informed Plaintiff of the following:

We have located approximately 445 pages which are potentially responsive to your request. Pursuant to the U.S. Department of Justice (DOJ) regulations, 28 C.F.R. §§ 16.11 and 16.49, there is a duplication fee of ten cents per page if you

receive a paper copy. Releases are also available on CD upon request. The first 100 pages of duplication, or the cost equivalent ($10.00) for releases on CD, will be provided to you at no charge. In accordance with the DOJ regulations, the FBI notifies requesters when anticipated fees exceed $25.00. If all of the pages are released, you will owe $34.50 in duplication fees to receive a paper copy. If you opt to receive the release on CD, the CD will be provided to you at no charge. Please remember this is only an estimate, and if some of the pages are withheld in full pursuant to FOIA/Privacy Act exemption(s) or are determined to not be responsive to your request, the actual charges could be less.

A copy of said February 24, 2012, letter is attached hereto and incorporated by reference as Exhibit 13.

57. By reason of the fact alleged herein, Defendants SEC and FBI may not assert any exemptions to Plaintiff's requests for records and must produce said records without redactions.

## PLAINTIFF'S CLAIM FOR RELIEF: VIOLATIONS OF FOIA

58. Plaintiff realleges and incorporates by reference all preceding paragraphs.

59. Plaintiff is entitled by law to access the records requested under FOIA.

60. Defendant SEC is in violation of FOIA, 5 U.S.C. § 552, by failing to fully and lawfully fulfill paragraphs 1 through 18 of Plaintiff's, November 14, 2011, request for records as specified in paragraph 40 above.

61. Defendant FBI is in violation of FOIA, 5 U.S.C. § 552, by failing to fully and lawfully fulfill paragraphs 1 through 16 of Plaintiff's January 2, 2012, request for records as specified in paragraph 52 above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare that Defendants SEC and FBI have violated the FOIA by failing to satisfy Plaintiff's November 14, 2011, and January 2, 2012, requests for records as specified in paragraphs 40 and 52 above;

B. Order Defendants SEC and FBI to immediately search for and release all records responsive to paragraphs 1 through 18 and 1 through 16 of Plaintiff's, requests for records as specified in paragraphs 40 and 52 above;

C.  Declare that Defendants SEC and FBI have violated the FOIA by failing to satisfy Plaintiff's November 14, 2011, and January 2, 2012, requests for records as specified in paragraphs 40 and 52 above;

D.  Order Defendant SEC to immediately search for and release all records responsive to paragraphs 1 through 18 of Plaintiff's November 14, 2011, request for the records as specified in paragraph 40 above;

E.  Order Defendant FBI to immediately search for and release all records responsive to paragraphs 1 through 16 of Plaintiff's January 2, 2012, request for records as specified in paragraph 52 above;

F.  Award Plaintiff his costs and reasonable attorneys' fees and litigation costs in this action; and

G.  Grant such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

DATED: April 24, 2012.

/s/ Gary J. Aguirre
Gary J. Aguirre, CA Bar #38927
Aguirre Law, A.P.C.
501 W Broadway, Ste 800
San Diego, CA 92101
Telephone:     619-400-4960
Facsimile:     619-501-7072

Attorney for Plaintiff Rodolfo Michelon

℀JS 44   (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Michelon, Rodolfo

## DEFENDANTS
U.S. Securities and Exchange Commission; Federal Bureau of Investigation ⊞

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Washington, D.C.
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
See Attachment

Attorneys (If Known)
'12CV1014 JAH MDD

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

❏ 1   U.S. Government Plaintiff
❏ 3   Federal Question (U.S. Government Not a Party)

☒ 2   U.S. Government Defendant
❏ 4   Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ❏ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ☒ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 462 Naturalization Application | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | ❏ 463 Habeas Corpus - | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | Alien Detainee | | ❏ 950 Constitutionality of |
| | Other | | ❏ 465 Other Immigration | | State Statutes |
| | ❏ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original Proceeding
❏ 2 Removed from State Court
❏ 3 Remanded from Appellate Court
❏ 4 Reinstated or Reopened
❏ 5 Transferred from another district (specify)
❏ 6 Multidistrict Litigation
❏ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 5 U.S.C. § 552

Brief description of cause:
Declaratory and Injunctive Relief under the Freedom of Information Act.

## VII. REQUESTED IN COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE ___   DOCKET NUMBER ___

DATE
04/24/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ___   AMOUNT ___   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___

**ATTACHMENT**

**I (c) Attorneys**

Gary J. Aguirre
Aguirre Law, APC
501 W. Broadway, Suite 800
San Diego, CA 92101
Phone: 619-400-4960

Daniel M. Gilleon
Mitchell Gilleon Law firm
1320 Columbia Street, Suite 200
San Diego, CA 92101
Phone: 619-702-8623